SAINT JOHN'S CHURCH IN the WIL-
DERNESS, a Colorado nonprofit corpo-
ration; Charles I. Thompson; and
Charles W. Berberich, Plaintiffs–Appel-
lees,

v.

Kenneth Tyler SCOTT and Clifton
Powell, Defendants–
Appellants.

No. 06CA2421.

Colorado Court of Appeals,
Div. IV.

Aug. 21, 2008.

* Sitting by assignment of the Chief Justice under
provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2007.

476

Faegre & Benson LLP, Russell O. Stewart, Denver, Colorado; Holme Roberts & Owen LLP, David R. Ball, Denver, Colorado, for Plaintiffs–Appellees.

Kenneth Tyler Scott, Pro Se.

Clifton Powell, Pro Se.

James P. Rouse, Greenwood Village, Colorado; Catherine W. Short, Ojai, California, for Amicus Curiae Life Legal Defense Foundation.

Opinion by Judge CARPARELLI.

This case arises from a demonstration at a church and implicates issues of free speech and the ability of church members to worship. Defendants, Kenneth Tyler Scott and Clifton Powell, appeal the judgments entered and the injunction issued in favor of plaintiffs, St. John's Church in the Wilderness (the Church), and Charles I. Thompson and Charles W. Berberich (the named parishioners) (collectively St. John's). We affirm the judgments, affirm the injunction in part and vacate it in part, and remand for further findings.

## I. Background

Scott and Powell led a demonstration at the Church. The Church and the named parishioners sued claiming Scott and Powell had created a private nuisance and had conspired to do so. The Church sought and obtained a permanent injunction against future demonstrations. Thus, this dispute requires the protection of the demonstrators' First Amendment rights to free speech as well as St. John's ability to worship.

On March 20, 2005, which was Palm Sunday, the Church held four religious services. Two of them included a liturgy on the lawn east of the Church, followed by a procession into the Church's north entrance. The Church had acquired a parade permit that restricted use of the sidewalk to accommodate the processions.

Scott and Powell preach and demonstrate against abortion and homosexuality. Together with five or six others, they demonstrated near the Church during the Palm Sunday services. The demonstrators stood in the street, across the street, and on their parked cars. As the parishioners arrived, and during the outdoor liturgies and processionals, at least one of the demonstrators shouted in a manner described as distracting, unpleasant, and unsettling. The demonstrators also displayed signs, some of which included graphic depictions of aborted fetuses.

After the Church sued and conducted discovery, it moved for summary judgment

against Scott and Powell. The trial court granted the motion only as to the private nuisance claim against Scott. After a bench trial, as pertinent here, the court entered a final judgment in favor of the Church and against Powell on the private nuisance claim and against Scott and Powell on the conspiracy to commit private nuisance claims. The court also issued a permanent injunction against Scott and Powell prohibiting them from entering the Church's premises, obstructing access to the Church, and entering and obstructing access through surrogates; and restricting their picketing activities and noise-making.

## II. Propriety of the Judgments

Scott contends that summary judgment should not have been granted against him on the private nuisance claim. We conclude that any error was harmless. We reject Powell's contention that the trial court erred when, at the conclusion of the trial, it found that his conduct created a private nuisance, and we reject Scott's and Powell's contentions that the court erred when it found that the two had engaged in a conspiracy to create a private nuisance.

### A. Law

■ To prove a private nuisance claim, a plaintiff must establish that (1) the defendant's conduct unreasonably interfered with the use and enjoyment of the plaintiff's property, (2) the interference was so substantial that it would have been offensive or caused inconvenience or annoyance to a reasonable person in the community, and (3) the interference was either negligent or intentional. *Public Service Co. v. Van Wyk*, 27 P.3d 377, 391 (Colo.2001).

We will not set aside the trial court's findings of fact unless they are clearly erroneous. C.R.C.P. 52.

### B. Summary Judgment Against Scott

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c). We review a trial court's grant of summary judgment de novo. *Aspen Wilderness Workshop,*

*Inc. v. Colorado Water Conservation Bd.,* 901 P.2d 1251, 1256 (Colo.1995).

■ The Church's summary judgment motion relied on evidence that Scott's voice was unusually loud and substantially interfered with the services. In his response, Scott argued that he did not interfere with worship at the Church. He relied on the deposition of a police officer who witnessed the demonstrations and stated that the demonstrators were peaceful, were not shouting, and that he did not believe that they interfered with anyone's ability to worship. Notwithstanding the officer's deposition testimony, the court granted summary judgment against Scott as to the private nuisance claim.

The private nuisance claim against Powell and the conspiracy claims against both Scott and Powell were tried. Thus, the facts and circumstances related to Scott's and Powell's actions at the Church were presented to the court through the testimony of witnesses, including two police officers. At the conclusion of the trial, the court found (1) the testimony of the priest and the named parishioners was more persuasive than that of the police officers with regard to Scott's and Powell's impact on the parishioners; (2) Scott's voice was so loud during the time that the processions were gathered on the east lawn and during the procession that it substantially interfered with the service; and (3) Scott and Powell caused people attending the services to be visibly upset, and one of the named parishioners was so distracted and upset, and Scott's voice was so loud, that he could not sing the hymns during the procession.

We conclude that, even assuming there was a genuine issue of material fact before trial regarding whether Scott's actions and voice substantially interfered with the service, there was a trial of the same facts, the court made findings regarding those facts, the record supports those findings, and the court's findings fully support the judgment against Scott as to the claim of private nuisance. Therefore, any error in granting summary judgment was rendered harmless. *See* C.R.C.P. 61; *Fairways Living, Inc. v. North Denver Bank,* 169 Colo. 23, 26, 453

P.2d 190, 191 (1969) (concluding that propriety of summary judgment mooted by subsequent trial and resolution of factual issues).

### C. Judgments Against Scott and Powell After Trial

After the trial, the court made extensive findings of fact about Scott's and Powell's conduct, its reasonableness, and its effect on the parishioners. The court found that:

- The Church owned the property in question;
- The property was used for worship;
- Powell interfered with worship at the Church;
- A reasonable person would find Powell's conduct offensive and annoying; and
- Powell's conduct was intentional or knowing.

On that basis, the court found for the Church on the private nuisance claim against Powell.

The court also found that:

- Scott and Powell belonged to a relatively small group that had actively participated in street preaching and demonstrations on hundreds of previous occasions during the last five to ten years;
- One or two weeks before the Palm Sunday protest, Scott and Powell made plans to protest at the Church;
- Scott's wife publicized the demonstration when she appeared on a television program and said that they were going to demonstrate at the Church on Palm Sunday while parishioners had their children with them;
- Scott and Powell met with other members of their group on the morning of Palm Sunday to prepare; and
- Scott supplied Powell and others with signs and posters.

On the basis of these findings, the court concluded that both Scott and Powell engaged in a civil conspiracy to commit a private nuisance.

■ We conclude that there is evidence in the record to support the court's findings and conclusions that Powell created a private nui-sance and that both Scott and Powell engaged in a civil conspiracy to create a private nuisance. Accordingly, we affirm the judgment regarding the private nuisance claim against Powell and the conspiracy claims against both Powell and Scott.

### III. Propriety of the Injunction

Scott and Powell contend that the injunction is unconstitutional because it places impermissible content-based restrictions on their First Amendment rights to freedom of speech. We affirm the injunction order in part, vacate it in part, and remand for additional findings.

### A. Threshold Requirements for Imposition of Injunctive Relief

We first determine that the threshold requirements for imposing injunctive relief were met, and, therefore, that it was proper for the court to issue an injunction.

■ "The grant or denial of injunctive relief lies within the sound discretion of the trial court and will be reversed only upon a showing of an abuse of that discretion." *Langlois v. Board of County Comm'rs,* 78 P.3d 1154, 1157 (Colo.App.2003).

■ "A party seeking a permanent injunction must show that: (1) the party has achieved actual success on the merits; (2) irreparable harm will result unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause to the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Langlois,* 78 P.3d at 1158.

*Success on the Merits.* In the trial court, the Church was successful as to all claims against Scott and Powell and we affirm the judgments.

*Irreparable Harm.* The trial court found that, unless the demonstrators were enjoined, they would engage in substantially the same type of protests in the future, and that such protests would irreparably harm and interfere with the named parishioners' ability to worship at the Church and the Church's ability to use its property for wor-

ship services. Because there is record support for these findings, we may not disturb them.

*Potential Harm to the Demonstrators.* Scott and Powell assert that the injunction violates their constitutional free speech rights, but do not assert that the injunction adversely affects the public interest. With regard to an injunction's potential harm to Scott and Powell, the court found that the threatened injury to the Church outweighs their First Amendment rights and their interests in not having restrictions placed on their demonstrations.

When reviewing the trial court's weighing of the injury to the Church and the potential harm to Scott and Powell, we must consider the purposes of the injunction and the nature and extent of the restrictions it establishes.

### B. Prohibition of Conduct Not Inherently Expressive

The injunction prohibits Scott and Powell from entering the Church's property, obstructing access to the Church, and entering and obstructing access through surrogates. We conclude that entering the Church's property and obstructing access to the Church are not inherently expressive acts. *See Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 66, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) (First Amendment extends only to conduct that is inherently expressive); *United States v. O'Brien*, 391 U.S. 367, 376, 384, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) .(destruction of Selective Service certificates is not inevitably or necessarily expressive, and, thus, is not protected speech). Accordingly, we also conclude that the injunction's prohibitions of such conduct are not restrictions on speech. Nonetheless, we conclude that the Church did not prove that Scott's and Powell's mere entry onto and presence on its property will result in irreparable harm, and, therefore, the prohibition against entry must be vacated.

### 1. Three Prohibitions

The injunction prohibits Scott and Powell from engaging in the following conduct.

(i) [Prohibition Against Entry] At all times on all days, from entering the premises and property of St. John's Church.

(ii) [Prohibition Against Obstructing Access] At all times on all days, from blocking impeding, inhibiting, or in any other manner obstructing or interfering with access to, ingress into and egress from any building or parking lot owned by St. John's Church.

(iii) [Prohibition Against Entering and Obstructing Access Through Surrogates] At all times on all days, from encouraging, inciting, or securing other persons to commit any of the prohibited acts listed herein.

### 2. Prohibition Against Entry

█ There is no evidence that Scott and Powell entered the Church, or the Church's property, created a private nuisance inside the Church, or conspired to do so. Nor is there evidence that their *mere presence* on Church property injures the Church, the named parishioners, other parishioners, or children. Therefore, we conclude that the Church has not proved that irreparable harm will result unless Scott and Powell are prohibited, on all days and at all times, from entering the Church's premises or property.

### 3. Prohibition Against Obstructing Access

█ Although there is evidence that parishioners approaching the Church, particularly from the north parking area, were bothered by Scott's and Powell's conduct, there is no evidence that Scott and Powell impeded anyone's access to the Church entrances or parking areas. Nonetheless, the evidence is sufficient to prove that Scott and Powell created a private nuisance and that they conspired to create a private nuisance at the Church. We conclude that these findings are sufficient to support the provision prohibiting Scott and Powell, at all times on all days, from blocking, impeding, inhibiting, or in any other manner obstructing or interfering with access to, ingress into, and egress from any building or parking lot owned by the Church because such conduct would harm parishioners' ability to worship.

We also conclude that such injury would be irreparable and would outweigh the negligible harm that this provision of the injunction might cause to Scott and Powell. Scott and Powell do not assert that this provision would harm the public interest.

We therefore conclude that the trial court did not err when it included these prohibitions in the injunction.

### 4. Prohibition Against Violating the Injunction Through Surrogates

The United States Supreme Court has upheld an injunction enjoining demonstrators "from encouraging, inciting, or securing other persons to commit any of the prohibited acts listed herein." *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 761, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). Responding to the demonstrators' argument that the provision impermissibly limited their freedom of association, the Court held that "[t]he freedom of association protected by the First Amendment does not extend to joining with others for the purpose of depriving third parties of their lawful rights." *Madsen*, 512 U.S. at 776, 114 S.Ct. 2516.

■ Here, the trial court made sufficient findings of fact to support the civil conspiracy judgments against Scott and Powell. The prohibition against using surrogates enjoins them from engaging in further civil conspiracies to violate the injunction and, thereby, from committing a private nuisance against the Church. We therefore conclude that the trial court did not err when it included this prohibition in the injunction.

### C. Speech Restrictions

We now consider the restrictions on picketing and noise and conclude that they restrict Scott's and Powell's free speech rights and that the court's findings are not sufficient to enable us to determine whether the restrictions burden more speech than necessary to protect the relevant government interests. We therefore remand for further findings.

### 1. Law

■ It has long been recognized that public streets and sidewalks may be used for public assembly and debate. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). In public forums, the government may not restrict communicative activity based on its content unless it shows that the restriction "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n*, 460 U.S. at 45, 103 S.Ct. 948. When a restriction on communicative activity in such forums is independent of its content, it is said to be "content-neutral."

■ *Restrictions Imposed by Statute or Ordinance.* The government may, by statute or ordinance, impose content-neutral restrictions on communicative activity if the restrictions are narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication. *Madsen*, 512 U.S. at 764, 114 S.Ct. 2516; *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *Perry Educ. Ass'n*, 460 U.S. at 45, 103 S.Ct. 948.

■ *Restrictions Imposed by Injunction.* However, when content-neutral restrictions are imposed by an injunction, they "carry greater risks of censorship and discriminatory application than [when they are imposed by] general ordinances." *Madsen*, 512 U.S. at 764, 114 S.Ct. 2516. Accordingly, the Supreme Court held that when an injunction imposes content-neutral restrictions on public speech, we must determine "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." *Madsen*, 512 U.S. at 765, 114 S.Ct. 2516.

■■ When evaluating content-neutrality, the principal question "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791, 109 S.Ct. 2746. The fact that an injunction applies only to people "with a particular viewpoint does not itself render the injunction content or viewpoint based." *Madsen*,

512 U.S. at 763, 114 S.Ct. 2516. It is particularly informative to look at the nature of the restrictions imposed to determine whether they are directed at and restrict the content of the message. *Madsen*, 512 U.S. at 763, 114 S.Ct. 2516; *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir.1998).

*Restrictions on Place.* The Supreme Court has said that a restriction is content-neutral when it limits *"where* some speech may occur," rather than the right to speak, and that it is not content-neutral when it prohibits or limits the expression of specific viewpoints or topics. *Hill v. Colorado*, 530 U.S. 703, 719, 722–23, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (emphasis added).

In *Hill*, the Supreme Court reviewed the constitutionality of section 18–9–122(3), C.R.S.2007, which makes it unlawful for any person within one hundred feet of the entrance to a health care facility to knowingly approach within eight feet of another person, without that person's consent, in order to pass "a leaflet or handbill to, display[ ] a sign to, or engag[e] in oral protest, education, or counseling with [that] person." The legislative history made clear that enactment of the statute was primarily motivated by activities in the vicinity of abortion clinics. The Court concluded that the statute does not regulate speech, but the places where some speech may occur. The Court also concluded that, although the *conduct* of partisans on one side of the abortion debate was the motivating force behind the statute, the statute was not "viewpoint based" and was not adopted because of disagreement with the message conveyed in the affected speech. *Hill*, 530 U.S. at 719, 724, 120 S.Ct. 2480. Thus, the Court concluded that, despite the impetus for enactment of the statute, it was content-neutral. *Hill*, 530 U.S. at 715, 120 S.Ct. 2480.

*Restrictions on Manner.* An injunction similar to the one here was considered by the Supreme Court of North Dakota. There the court ruled that "[w]hen [a content-neutral] injunction is based on a record of force, trespass and intimidation, the justification for the injunction is the *method* of communicating, not the motivating idea." *Fargo Women's Health Organization, Inc. v. Lambs of Christ*, 488 N.W.2d 401, 408 (N.D.

1992) (emphasis added). The Supreme Court of California found that the purpose of similar injunctions "was to ameliorate the confrontational tactics of [the demonstrators] and to prevent the physical intimidation that resulted in higher stress and anxiety. The target was thus [the demonstrators'] *physical* tactics, not their anti-abortion message." *Planned Parenthood Shasta–Diablo, Inc. v. Williams*, 10 Cal.4th 1009, 43 Cal.Rptr.2d 88, 898 P.2d 402, 409 (1995) (italics in original).

Applying these considerations, we first determine that the restrictions imposed here are content-neutral and consider whether they burden no more speech than necessary to protect the governmental interests the trial court sought to protect.

### 2. Conclusions Regarding Content Neutrality

We first consider the purposes for the injunction as detailed by the court and conclude that they are content-neutral.

#### a. Ability to Worship

[15] The trial court stated that the purposes of the injunction included preventing interference with parishioners' ability to worship and protecting the Church's ability to use its property for worship services. These purposes are supported by the court's findings that:

- From the time the congregation gathered on the east lawn for prayers and the blessing of the palms, defendant Scott spoke in an extremely loud voice that was variously described as yelling, shouting, and screaming;
- Defendant Scott's voice was so loud during the time that the processions were gathered on the east lawn and during the procession that it substantially interfered with the service;
- The demonstrators were about twenty feet from the people in the procession as the procession went by;
- Defendant Scott continued to vocalize at the same volume as the procession passed about twenty feet from him; and
- One parishioner was not able to sing the hymns during the procession because he

was so distracted and upset and because defendant Scott's voice was so loud.

The court also premised the injunction on the demonstrators' conduct before and after the outside liturgy and processional. The court found:

- Defendant Scott shouted his message at parishioners who came to the services late; and
- Defendant Powell stood on the north side of 14th Avenue by the passageway between the Church's north parking lot and the Church and attempted to engage the parishioners in a voice that was described as loud, angry, and confrontational.

Nonetheless, the court also found that the demonstrators' did not engage in any physical violence or attempt to physically block people from moving about or to follow people to or from their cars or otherwise.

The government has a legitimate interest in protecting the privacy of places of worship. *Olmer v. City of Lincoln*, 192 F.3d 1176 (8th Cir.1999); *Action v. Gannon*, 450 F.2d 1227, 1233 (8th Cir.1971); *St. David's Episcopal Church v. Westboro Baptist Church, Inc.*, 22 Kan.App.2d 537, 921 P.2d 821 (1996); *see also Gregory v. City of Chicago*, 394 U.S. 111, 118, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969) (governments may pass laws to protect the tranquility of spots where people escape the hurly-burly of the outside world, or where they require peace and quiet to carry out their functions).

Accordingly, we conclude that protection of the ability to worship and the privacy of places of worship are proper content-neutral purposes.

### b. Protection of Children

The trial court also stated that one of the purposes of the injunction was to protect children who were present, especially with regard to several 3' × 4.5' posters of mutilated fetuses that the demonstrators displayed. The court found:

- There were approximately 200 children in the procession and they were exposed to the demonstrators' conduct;

- Parents were concerned about the effect of the demonstrators' tactics on the children;
- The priest's seven-year-old daughter buried her face in her hymnal as she passed the demonstrators and remained upset about the posters several days later; and
- The posters were highly disturbing to both adults and children in the congregation because of their gruesomeness or goriness apart from any message intended to be conveyed.

In *Becker v. F.C.C.*, 95 F.3d 75, 80 (D.C.Cir.1996), the court recognized a government interest in protecting children from images of aborted fetuses on broadcast television, finding that the images "are not indecent but may nevertheless prove harmful."

In *Olmer*, the court concluded that although it was not necessary to protect children against all signs demonstrators might display, the government has a significant, compelling, and legitimate interest in protecting very young children from frightening and gruesome images such as pictures of dead bodies. *Olmer*, 192 F.3d at 1180.

Frightening and gruesome images of dead bodies are a *method* of communicating a viewpoint. Consequently, restriction of such methods to protect children does not restrict the communication of the viewpoint itself. Therefore, we conclude that protection of children from the undeniably gruesome pictures at issue here is a proper content-neutral purpose.

### c. Personal Privacy

The court also premised the injunction on the intrusiveness of the demonstrators' methods. This is reflected in the court's finding that Scott and Powell caused people attending the services to be visibly upset and that a significant number of them were shaking, crying, angry, and frightened. The court also found that the aggressiveness of the demonstrators caused the priest to remain outside to act as a buffer between the demonstrators and parishioners crossing the street and participating in the processional.

In *Hill,* the Supreme Court upheld statutory restrictions that protect the rights of individuals approaching and entering health clinics to pass without obstruction and to be free "from persistent 'importunity, following and dogging' after an offer to communicate has been declined." *Hill,* 530 U.S. at 718, 120 S.Ct. 2480. The Court held that "the right of every person 'to be let alone' must be placed in the scales with the right of others to communicate." *Hill,* 530 U.S. at 718, 120 S.Ct. 2480 (quoting *Rowan v. United States Post Office Dep't,* 397 U.S. 728, 736, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970)). The Court explained further that "[i]t may not be the content of the speech, as much as the deliberate 'verbal or visual assault,' that justifies proscription." *Hill,* 530 U.S. at 716, 120 S.Ct. 2480 (quoting *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 210–11 n. 6, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975)).

Accordingly, we conclude that protection of the personal privacy of the parishioners is also a proper content-neutral purpose.

3. Burden on Scott's and Powell's Speech

Having concluded that the injunction is content-neutral, we now apply the standard established in *Madsen* to determine whether the restrictions in the injunction burden no more speech than necessary to serve these recognized content-neutral purposes. *Madsen,* 512 U.S. at 765, 114 S.Ct. 2516. We conclude that the restrictions on the times when Scott and Powell may demonstrate at the Church do not burden more speech than is necessary to serve the interests the injunction protects. However, we conclude that the court's findings are not sufficient to enable us to determine whether restrictions on the place and manner of future demonstrations do so.

a. The Restrictions

The trial court permanently enjoined Scott and Powell from engaging in the following conduct:

(i) [Restrictions on Picketing] During worship and preparation for worship, from a period beginning one-half hour before and ending one-half hour after a religious event or series of religious events, including but not limited to worship services on Sundays between the hours of 7:00 a.m. and 1:00 p.m., from focused picketing, congregating, patrolling, demonstrating or entering that portion of public right-of-way shown on Exhibit 1 attached hereto and incorporated by this reference.

(ii) [Restrictions on Noise] During worship and preparation for worship, from a period beginning one-half hour before and ending one-half hour after a religious event or series of religious events, including but not limited to worship services on Sundays between the hours of 7:00 a.m. and 1:00 p.m., from whistling, shouting, yelling, use of bullhorns, auto horns, sound amplification equipment or other sounds in areas highlighted in yellow on Exhibit 1.

Except for time limitations and the description of the buffer zone, these restrictions are nearly identical to restrictions the Supreme Court reviewed in *Madsen,* 512 U.S. at 759–60, 114 S.Ct. 2516.

The following graphic recreates the trial court's Exhibit 1, except that we have replaced the yellow highlighting with checkered and striped patterns. The Church occupies the block that is encircled by the checkered boundary. The checkered areas are sidewalks and the striped area is the street in which the injunction prohibits the foregoing conduct. We have also placed numbers adjacent to segments of the sidewalks to facilitate our analysis below.

The Restrictions on Picketing and Noise limit the time, place, and manner of Scott's and Powell's exercise of their free speech rights. Therefore, we now consider whether the restrictions on time, place, and manner burden those rights more than is necessary to protect the interests identified by the court. Although the restrictions on place and manner are intertwined and must each be considered in the context of the other, we discuss them separately for clarity.

### b. Time Restrictions

Here, unlike the restrictions in *Madsen*, the Restrictions on Picketing and Noise apply only during worship and preparation for worship at the church beginning a half hour before and ending a half hour after a

religious event or series of religious events. Hence, these restrictions do not limit Scott's and Powell's right to picket, congregate, patrol, demonstrate, whistle, shout, yell, use bullhorns, use auto horns, or use sound amplification equipment or enter the buffer zone at any other time. The restrictions are only in effect when many people are likely to be accessing the Church and such conduct could again impose a private nuisance on the Church.

Accordingly, we conclude that these time limitations burden no more speech than necessary to serve the interests protected by the injunction.

### c. Place Restrictions

Unlike the buffer zones in *Madsen* and *Hill*, the place restrictions here are not defined by a perimeter drawn a given distance from the protected facility. Instead, they are defined by the map attached as exhibit 1 to the court's order. The restriction that is most analogous to the buffer zones in those cases is the restriction against entering the sidewalks around the city block occupied by the church and its related buildings, lawns, and parking areas.

To determine whether the limitations on where Scott and Powell may exercise their free speech burden more speech than is necessary to protect access to the Church, we, like the Supreme Court in *Madsen*, consider each portion of the buffer zone separately as follows (the numbering of which corresponds to the numbering indicated on the graphic shown earlier):

1. the sidewalk south of the Church along 13th Avenue;

2. the sidewalk west of the Church along Washington Street;

3. the sidewalk east of the Church on the west side of Clarkson Street;

4. the sidewalk east of the Church on the east side of Clarkson Street beginning at 14th Avenue and extending south two hundred feet;

5. the sidewalk north of the Church along 14th Avenue and the south half of 14th Avenue adjacent to the sidewalk, including the parking spaces; and

6. the sidewalks on the north side of 14th Avenue and the east side of the sidewalk along Clarkson Street north of 14th Avenue.

In *Madsen*, the trial court prohibited the demonstrators from "congregating, picketing, patrolling, demonstrating or entering that portion of the public right-of-way or private property within [36] feet of the property line of [a health clinic that performed abortions]." *Madsen*, 512 U.S. at 759, 114 S.Ct. 2516. There, the buffer zone protected the entrances to the clinic and the parking lot as a means of protecting unfettered ingress to and egress from the clinic. The Supreme Court noted that an earlier injunction had included no buffer zone and permitted the demonstrators to be on the clinic's sidewalk and driveway, but had failed to protect access. It also noted that restricting the demonstrators from being on the sidewalk, but allowing them to be on the adjacent street would block vehicular traffic. However, permitting demonstrators to stand across the street would enable them to be seen and heard from the clinic parking lots, and there was evidence that the buffer zone permitted the demonstrators to be as close as ten to twelve feet from cars approaching and leaving the clinic. *Madsen*, 512 U.S. at 769, 114 S.Ct. 2516.

Although the Supreme Court said the need for a complete buffer zone near the clinic entrances and driveway might be debatable, it deferred to the trial court's familiarity with the facts of the dispute and held that the thirty-six-foot buffer zone *around the entrances and driveway* burdened no more speech than necessary to accomplish the permissible interest of protecting unfettered ingress to and egress from the clinic. *Madsen*, 512 U.S. at 769–70, 114 S.Ct. 2516.

However, portions of the buffer zone were on private property that patients and staff did not have access to and there was no evidence that the protestors who had been on the property had obstructed access to the clinic or blocked traffic. The Court concluded that, absent such evidence, that portion of the buffer zone burdened more speech than necessary to protect access to the clinic. *Madsen*, 512 U.S. at 771, 114 S.Ct. 2516.

On the record here, we are not able to determine whether the buffer zone burdens more speech than is necessary to protect the interests the court sought to protect, and, therefore, conclude that we must remand to the trial court to make additional findings and conclusions as described in subsection 4, below, and, if necessary, to amend the injunction.

### d. Manner Restrictions

The manner restrictions enjoin Scott and Powell from focused picketing, congregating, patrolling, demonstrating, or entering the marked zones; from whistling, shouting, or yelling in the marked zones; and from using bullhorns, auto horns, and sound amplification equipment in the marked zones.

In *Madsen,* the Supreme Court ruled that the injury to the clinic, its staff, and its patients outweighed the harm that identical restrictions might cause the abortion protesters. *Madsen,* 512 U.S. at 772, 114 S.Ct. 2516. However in *St. David's,* the Court of Appeals of Kansas rejected an injunction's proscription of noise because there was not yet any evidence that noise from picketing activities interfered with worship. *St. David's,* 921 P.2d at 832.

In *Hill,* the Supreme Court upheld a Colorado statute preventing demonstrators from knowingly approaching within eight feet of a person without that person's consent for the purpose of passing out leaflets, displaying signs, or engaging in oral protest or education. *Hill,* 530 U.S. at 728, 120 S.Ct. 2480. The Court concluded that the eight-foot distance struck a reasonable balance between the demonstrators' rights to speech and the listeners' right to decline their advances. *Hill,* 530 U.S. at 728, 120 S.Ct. 2480.

Here, the trial court did not make specific findings justifying the scope and extent of the manner restrictions and, absent such findings, we are unable to determine whether they burden no more speech than necessary to protect the identified governmental interests. Therefore, we remand to the court to make findings and conclusions as to each section of the buffer zone and, as necessary, to amend the injunction.

### 4. Conclusions

Thus, we conclude that the time limitations on Scott's and Powell's speech burden no more speech than necessary to serve the interests protected by the injunction. However, on the record here, we are not able to determine whether the place and manner restrictions burden more speech than is necessary, and, therefore, remand for additional findings of fact and conclusions of law as to each of the six portions of the buffer zone with regard to the following issues:

- Whether Scott and Powell engaged in demonstrations in or near that area;
- The nature of their conduct in that area;
- Whether and, if so, how their conduct adversely affected the interests of St. John's or the government;
- The permissible purpose(s) (e.g., protection of the parishioners' ability to worship, the Church's ability to use its property for worship services, privacy of places of worship, children, or personal privacy of the parishioners) the place and manner restrictions of the described conduct serve; and
- Whether the place and manner restrictions of Scott's and Powell's conduct in that portion of the buffer zone burden more speech than necessary to serve the interests protected by the injunction.

The court may, in its discretion, enter findings and conclusions based on the existing record; request briefs or arguments; or permit the parties to present additional evidence.

### IV. Costs

Scott and Powell contend that the trial court erred when it awarded the Church its costs for taking pretrial depositions. We disagree.

"Deposition costs are allowed when the taking of the deposition and its general content were reasonably necessary for the development of the case in light of facts known to counsel when the deposition was taken." *Kennedy v. King Soopers Inc.,* 148 P.3d 385, 389 (Colo.App.2006). Trial courts may use their discretion to award as

costs the expenses of taking discovery depositions. *Cherry Creek School Dist. No. 5 v. Voelker*, 859 P.2d 805, 813–14, (Colo.1993). "The reasonableness of the costs and their amount is a matter within the sound discretion of the trial court, and we will not disturb that determination on appeal absent an abuse of discretion." *Harvey v. Farmers Ins. Exchange*, 983 P.2d 34, 41 (Colo.App.1998), *aff'd sub nom. Slack v. Farmers Ins. Exchange*, 5 P.3d 280 (Colo.2000).

 Here, the court awarded the costs of taking depositions which it determined were reasonably necessary for the development of the case. We conclude that the court did not abuse its discretion in making that determination or in awarding costs.

### V. Marital Privilege

Scott contends that the trial court erred when it admitted into evidence a recording of an interview his wife gave on television about the planned demonstration because of the marital privilege. Because the marital privilege does not extend to communications made in the presence of a third party, we disagree. *South Carolina Ins. Co. v. Fisher*, 698 P.2d 1369, 1372 (Colo.App. 1984).

### VI. Hearsay

We reject Powell's contention that the court erred when it permitted a witness to testify regarding his daughter's reactions to the protests and another witness to testify regarding his grandson's reactions.

The first witness testified that two or three nights after Palm Sunday, as he was tucking his daughter into bed, she said that the demonstrations made her feel scared. Powell objected to the testimony as hearsay, and the court overruled the objection and concluded that the testimony constituted a CRE 803(3) then-existing state of mind exception because the witness testified about how his daughter said she felt on the night he was tucking her in.

The second witness testified that his adult daughter was very upset and that she did not allow her son, the witness's grandson, to participate in the service on the lawn because of the demonstrations. Powell objected on hearsay grounds, and the court overruled the objection and concluded that the testimony constituted a CRE 803(3) then-existing state of mind and statement of intent exception because the witness testified to his daughter's feelings at the time and her intent not to allow her son to participate.

We conclude that the testimony was admissible under CRE 801 and 803, and, therefore, that the trial court did not abuse its discretion.

The judgments are affirmed. The injunction order is vacated as to the restriction on Scott's and Powell's entry onto the Church's property; the case is remanded for specific findings and, if necessary, amendment of the injunction as to the place and manner restrictions on picketing and noise in each buffer zone; and the injunction is affirmed in all other respects.

Judge LOEB and Judge STERNBERG * concur.